*Michael O'Sullivan v. State of Maryland*, No. 3, September Term, 2021.
Opinion by Biran, J.


**PERJURY – PROSECUTION'S BURDEN OF PRODUCTION – COMMON LAW "TWO-WITNESS" RULE –** The Court of Appeals declined to abrogate Maryland's common law "two-witness" rule. The rule provides that the State does not meet its burden of production with respect to the falsity element of a perjury prosecution if it offers only a single witness who testifies directly and positively that the defendant's prior testimony was false. The State can prove falsity entirely through circumstantial evidence, by introducing direct evidence of falsity through multiple witnesses, or by introducing circumstantial evidence as well as direct evidence of falsity through one or more witnesses.

**APPELLATE REVIEW – SUFFICIENCY OF THE EVIDENCE – PERJURY –** The Court of Appeals held that, where the State meets its burden of production under the two-witness rule, appellate courts review the sufficiency of the evidence supporting a perjury conviction as they do in any other case, asking whether any rational trier of fact could find each element of the offense, including falsity, beyond a reasonable doubt. In this case, the State introduced sufficient evidence to convict Petitioner, a police officer who allegedly testified falsely at the trial of an arrestee, of perjury and misconduct in office.

Circuit Court for Baltimore City
Case No. 119148010
Argued: September 13, 2021

IN THE COURT OF APPEALS

OF MARYLAND

No. 3

September Term, 2021

---

MICHAEL O'SULLIVAN

v.

STATE OF MARYLAND

---

Getty, C.J.
McDonald
Watts
Hotten
Booth
Biran
Raker, Irma S.
    (Senior Judge, Specially Assigned),

JJ.

---

Opinion by Biran, J.
McDonald and Raker, JJ., concur and dissent.

---

Filed: December 17, 2021

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

Under Maryland's common law, the State may not obtain a conviction for perjury based solely on the word of one witness who testifies at trial that the defendant gave false testimony in the underlying case. If the State introduces that kind of direct evidence through a witness, the State must either put on a second witness who also provides direct evidence of the falsity of the defendant's prior testimony, or the State must introduce – in place of a second witness – other evidence that tends to corroborate the sole witness's claim that the defendant provided false testimony. This burden of production has come to be known as the "two-witness rule." Although the rule has been criticized in some quarters for many years, it has endured in perjury cases in Maryland, as well as in many other states and in the federal criminal justice system. In this case, taking up the cause of the two-witness rule's critics, the State asks us to judicially abrogate the rule in Maryland.

The State prosecuted Michael O'Sullivan, the Petitioner here, for perjury and misconduct in office. O'Sullivan was a veteran officer in the Baltimore Police Department when he was charged. After participating in an arrest of Yusuf Smith, O'Sullivan testified at Smith's trial in the District Court of Maryland that he saw Smith remove something from his waistband and toss it; according to O'Sullivan, the object he saw Smith discard was a .32 caliber revolver that O'Sullivan subsequently recovered. Based on O'Sullivan's testimony, the District Court found Smith guilty of a handgun charge and related offenses. Smith then appealed his convictions to the Circuit Court for Baltimore City. Before the appeal was heard, the State dismissed the case against Smith and began investigating O'Sullivan. The State subsequently obtained an indictment charging O'Sullivan with

perjury and misconduct in office based on his allegedly false testimony at Smith's District Court trial.

At O'Sullivan's nonjury trial in the Circuit Court for Baltimore City, the State called Smith as a witness. Smith testified that O'Sullivan provided untrue testimony at Smith's trial when O'Sullivan claimed to have seen Smith remove a handgun from his waistband and throw it to the ground. In addition, the State introduced video footage from body cameras worn by O'Sullivan and another officer, which showed the two officers approach the area where O'Sullivan claimed he saw Smith discard an object. The footage from O'Sullivan's camera also showed him recover the revolver. The State argued that the video footage showed it was impossible for O'Sullivan to have seen Smith discard the revolver and, therefore, that O'Sullivan had testified falsely at Smith's trial. The circuit court found O'Sullivan guilty of perjury and misconduct in office.

The Court of Special Appeals affirmed O'Sullivan's convictions, holding that the two-witness rule did not apply to O'Sullivan's perjury charge because a reasonable factfinder could conclude that O'Sullivan testified falsely at Smith's trial, based solely on the video footage. Alternatively, the court held that the State satisfied the two-witness rule because the video footage sufficiently corroborated Smith's testimony.

O'Sullivan filed a petition for *certiorari* in this Court, contending that both of the intermediate appellate court's bases for affirmance are erroneous. The State filed a conditional cross-petition for *certiorari*, asking us to abrogate the two-witness rule prospectively. We granted both petitions.

For the reasons stated below, we decline to abrogate the two-witness rule. Further, we conclude that, in this case, the State met its burden of production under the two-witness rule as well as its burden to persuade the trier of fact beyond a reasonable doubt that O'Sullivan was guilty of perjury and misconduct in office.

**I**

**Background**

**A. The Two-Witness Rule**

In *Brown v. State*, 225 Md. 610, 615-16 (1961), this Court noted that there had "been few cases in Maryland dealing with the crime of perjury and, so far as we know, none where the quantum of proof necessary for conviction has been before this Court." The Court explained that, "[a]t common law it was originally held that to warrant a conviction of perjury the falsity had to be shown by direct and positive testimony of two witnesses," and that perjury "required a greater measure of proof than any other crime known to law, treason alone excepted." *Id.* at 616. In defining the two-witness rule's parameters, the Court observed that the rule had "been relaxed so as to allow a conviction of perjury to stand if there are two witnesses, or one witness corroborated by circumstances proved by independent testimony." *Id.* The Court further stated that, if the State opts to produce a single direct witness and corroborating circumstantial evidence, the circumstantial evidence must be "of such a nature so as to be of equal weight to that of at least a second

3

witness, thus foreclosing any reasonable hypothesis other than the defendant's guilt." *Id.* at 616-17.

This relaxation of the two-witness rule is a deviation from its history of strict application in medieval ecclesiastical courts, which conceived "of the oath as a formal act, mechanically and ipso facto efficacious ... and quantitative in its nature." *Hourie v. State*, 53 Md. App. 62, 70-71 (1982) ("*Hourie I*") (internal quotation marks and emphasis omitted). Under those courts' quantitative system of proof, "a degree of greater certainty [was] thought to be attained, not by analyzing the significance of each oath in itself and relatively to the person, but by increasing the number of the oaths." *Id.* at 71 (internal quotation marks and citation omitted). Relying on the quantity, rather than the quality of testimony, ecclesiastical law "elaborated many specific rules as to the number of witnesses necessary in various situations; against a cardinal, for example, twelve or perhaps forty-four witnesses were required." John H. Wigmore, *Required Numbers of Witnesses; A Brief History of the Numerical System in England*, 15 Harv. L. Rev. 83, 84 (1901).

Although the rule endured in civil and ecclesiastical courts for centuries, most notably the Court of the Star Chamber,

> [t]here was no such rule in use in common law courts until the first half of the Eighteenth Century. 7 *Wigmore*, *Evidence* § 2040 (Chadbourn rev. 1978). In 1640, the Court of the Star Chamber was abolished and its jurisdiction transferred to the King's Bench.... Since the crime of perjury had been prosecuted almost entirely in the Star Chamber, it follows that the rule requiring two witnesses accompanied the transfer of jurisdiction to the King's Bench. 7 *Wigmore*, *Id.* Since perjury was one of the few crimes in which the accused was allowed to testify, the rule gained acceptance in the common law court. If only one person's testimony was offered against the accused, the situation would present oath against oath, or a "draw". The

4

quantitative theory of testimony, then, played a key role in the establishment of the rule.

*Smith v. State*, 51 Md. App. 408, 420-21 (1982).

While the quantitative system of proof was replaced at common law with a system that relies upon the quality of the prosecution's proof, the relaxed two-witness rule has endured in perjury cases in which the State has opted to introduce direct evidence of falsity through the testimony of at least one witness. Most recently, in *State v. McGagh*, 472 Md. 168 (2021), after a nonjury trial, the circuit court convicted McGagh of perjury for falsely averring that a Verizon Wireless employee had sexually assaulted her. *Id.* at 181-82. At trial, the State introduced both the testimony of the employee McGagh had accused of sexual assault, as well as surveillance footage from the Verizon store. The circuit court found McGagh guilty of perjury, based in part on the value the court assigned to the surveillance video. *Id.* at 179, 181. This Court upheld the conviction, concluding that

> [t]he Verizon surveillance video in this case also satisfies the purpose of the two-witness rule articulated in *Brown*. The two-witness rule prevents "oath against oath" by allowing the fact finder to observe and judge the credibility of witnesses offering competing recollections of events, while comparing the witness statements against independent, circumstantial evidence. The trial court here had the opportunity to judge and observe McGagh's and [the Verizon employee's] testimony. The Verizon surveillance video provided independent corroboration of the pertinent factual dispute: whether [the Verizon employee] cupped McGagh's breast and touched her inner thigh.

*Id.* at 202; *see also Mason v. State*, 225 Md. App. 467, 491 (2015) (applying the two-witness rule and determining that there was sufficient evidence to sustain Mason's conviction for perjury where the State introduced both direct and circumstantial evidence).

Although the two-witness rule has endured in Maryland, this Court and the Court of Special Appeals have affirmed perjury convictions where the State did not put on the direct testimony of at least one witness to prove the element of falsity, but rather proved falsity entirely through other evidence. *Brown* itself was such a case. As the Court of Special Appeals explained in *Hourie I*, although the *Brown* Court "paid lip service to the relaxed two-witness rule," a "close reading reveals nothing but circumstantial evidence as to the key element of the falsity of the allegedly perjurious testimony." *Hourie I*, 53 Md. App. at 78 n.15. The defendant in *Brown* was charged with perjury, based on her testimony in a civil trial that she had not signed the confessed judgment note at issue in that case. *See Brown*, 225 Md. at 613. The Court of Special Appeals' description of the evidence the State introduced in *Brown* to prove the falsity of Brown's testimony in the civil trial demonstrates that the two-witness rule did not come into play in that perjury prosecution:

> The circumstantial case of falsity consisted of the confessed judgment note itself bearing what was determined to be the defendant's signature. To prove this single fact, a number of links were necessary to forge the chain. The State called the bank official who received the note itself with its questioned signature; several other witnesses who supplied, for comparison purposes, documents bearing the known signature of the defendant; and the handwriting examiner who offered the expert opinion that the known and questioned signatures emanated from the same source. This multiplication of witnesses, however, is not the multiplication contemplated by the two-witness rule (even in its relaxed form of one witness plus corroboration). The two-witness rule mandated two direct witnesses (or at least one corroborated direct witness) who could testify on oath that the defendant's earlier testimony was false. The two-witness rule had nothing to do with the total number of witnesses paraded to the stand by the State to prove elements of perjury other than the falsity or to provide circumstantial proof of the element of falsity itself. The reality … is that the circumstantial evidence (the proved signature on the document) was not the "functional equivalent of a second witness" but was legally sufficient proof of guilt all by itself. The document

did not corroborate even a single direct witness as to falsity; standing alone, it established that falsity.

*Hourie I*, 53 Md. App. at 78 n.15.

Similarly, in *Smith*, the Court of Special Appeals affirmed Smith's perjury conviction based on her testimony in a prior case that she had sent refunds to two customers. At Smith's perjury trial, the customers (Berry and Farber) testified that they did not receive the checks Smith claimed to have sent them. *Smith*, 51 Md. App. at 410-11. The State also introduced evidence of unsatisfied judgments that Berry and Farber had obtained against Smith in the District Court, from which the jury could infer that Smith knew they were unpaid. *Id.* at 411, 425. Further, the Court of Special Appeals noted, the jury had the opportunity to observe Smith's demeanor and attitude on the stand during the perjury trial, and could form its own opinion as to her veracity. *Id.* at 425. Based on this evidence, the jury could find beyond a reasonable doubt that Smith's testimony in the prior case was false, despite the fact that "there was no direct and positive testimony [at the perjury trial] that [Smith] did not, in fact, send the checks to Berry and Farber[.]" *Id.* The Court of Special Appeals relied on *Brown* in concluding that the State was permitted to prove the element of falsity entirely through circumstantial evidence: "The mandate of *Brown* is clear. Pursuant to [that] mandate, we explicitly hold that where the State produces and relies upon circumstantial evidence, that circumstantial evidence in and of itself may be sufficient for a conviction of perjury, and the two witness rule is not applicable." *Id.* at 426.

The two-witness rule has long been the subject of criticism. *See, e.g.*, *Hourie I*, 53 Md. App. at 74-76, 81 (explaining that commentators such as Wigmore "are disdainful of the rule as an utterly discordant note in present-day jurisprudence" and describing the rule as a "[r]elic [f]ound in a [b]ottle" that owes its continuing existence to having "been in the right place at the right time"); *Smith*, 51 Md. App. at 422 ("While the rule may continue to serve a practical purpose by preventing charges based solely on annoyance or retaliation, … we are not sure that this purpose outweighs the desirability of consistency in proofs for the various criminal offenses."). These misgivings about the two-witness rule led the *Hourie I* Court to limit the rule's applicability to common-law perjury charges. *See Hourie I*, 53 Md. App. at 88.

In this Court's review of the Court of Special Appeals' decision in *Hourie I*, we stated that the two-witness rule should "be limited to the situation for which it was designed, namely to prevent a conviction of perjury when there is no evidence other than the word of one witness against that of the defendant," and that the rule "has no place in a case in which the falsity of [a] defendant's testimony can be established by evidence of a different kind." *Hourie v. State*, 298 Md. 50, 60-61 (1983) ("*Hourie II*") (quoting R. Perkins, Criminal Law (2d ed. 1969)). In *McGagh*, we expressed approval of the two-witness rule, opining that the rule's "logical underpinnings remain sound." 472 Md. at 199 n.14.

We glean from these cases that the two-witness rule, as it presently exists in Maryland, is a burden of production that applies *if* the State elects to present the testimony of a witness as "direct and positive" evidence of the element of falsity. *Brown*, 225 Md. at

8

616. If the State opts to introduce such witness testimony, the two-witness rule requires that the State do more: the State must also produce evidence from at least one additional witness that directly and positively contradicts the allegedly false testimony, or the State must introduce other evidence that tends to corroborate a sole witness's direct evidence, *i.e.*, that tends to establish the falsity of the defendant's prior testimony. If the State does not meet this burden of production, then the trial court must grant a defendant's motion for judgment of acquittal at the close of the State's case.[1] However, the State is not required to prove falsity in a perjury case by calling at least one witness who testifies that the defendant's prior testimony was false. Rather, the State may obtain a conviction for perjury if it produces "evidence of a different kind," *Hourie II*, 298 Md. at 61 (internal quotation marks and citation omitted), that is sufficient to prove the element of falsity beyond a reasonable doubt (assuming, of course, that the State also proves the other elements of perjury).

---

[1] As discussed above, prior cases discussing the two-witness rule have stated that, if the State produces direct and positive witness testimony as to falsity, as well as corroborating circumstantial evidence, the circumstantial evidence must be "of such a nature so as to be of equal weight to that of at least a second witness, thus foreclosing any reasonable hypothesis other than the defendant's guilt." *Brown*, 225 Md. at 616-17. This describes the burden of *persuasion* that the State must meet to obtain a conviction. *See also Smith*, 51 Md. App. at 421 (describing the "relaxed" rule as "allow[ing] a conviction to stand based on the testimony of one witness corroborated by circumstances sufficient to equal the weight of a second witness"). These references to the State's burden of persuasion in describing the two-witness rule, which is a burden of *production*, have led to confusion. We address the State's burden of persuasion – and how an appellate court should review the sufficiency of the evidence of falsity in a perjury case – in Section III.B. below.

**B. O'Sullivan's Perjury Prosecution**

This appeal arises from the conviction of Baltimore Police Officer Michael O'Sullivan stemming from his testimony at Yusuf Smith's criminal trial in the District Court of Maryland sitting in Baltimore City. After a nonjury trial in the Circuit Court for Baltimore City, the court found O'Sullivan guilty of perjury and misconduct in office, and the Court of Special Appeals affirmed O'Sullivan's convictions.

1.  Smith's Trial

At Smith's trial in the District Court in June 2018, O'Sullivan testified to the following: On May 1, 2018, O'Sullivan received information of criminal activity at the Alameda Apartments (the "Apartments") in Baltimore City. That afternoon, he and his supervisor, Sergeant Amy Streett, parked in the west surface lot of the Apartments and entered the Apartments' courtyard on foot. As O'Sullivan walked from the parking lot into the courtyard, he saw a man officers later identified as Smith standing near the rear corner of the Apartments next to another man named Shaqeil Cozart. O'Sullivan testified that, as O'Sullivan

> walked into the complex, the second male, Mr. Cozart, fled on foot straight back. Mr. Yusuf Smith … removed an object from his waistband and threw it, and then ran what would be southbound through the rear of the courtyard.

O'Sullivan testified that he recovered a .32 caliber revolver on the ground after walking through the courtyard. Officers apprehended Smith as he ran through an alley south of the Apartments.

On direct examination, O'Sullivan identified the gun that he recovered, responded "Yes," when asked whether he saw someone throw it, and further stated that the person he saw throw the gun was Smith.

The District Court convicted Smith, after which Smith noted an appeal to the Circuit Court for Baltimore City. While that appeal was pending, the State dismissed the charges against Smith and began investigating O'Sullivan.

### 2. O'Sullivan's Trial for Perjury and Misconduct in Office

On May 28, 2019, a grand jury in Baltimore City indicted O'Sullivan for perjury, in violation of Md. Code, Crim. Law (CR) § 9-101, and for the common law offense of misconduct in office, for allegedly providing false testimony at Smith's trial. O'Sullivan elected a nonjury trial in the Circuit Court for Baltimore City, which took place over two days in October 2019.

The evidence adduced at trial, viewed in the light most favorable to the State, showed the following: On May 1, 2018, O'Sullivan and Sergeant Streett were on patrol on The Alameda in Baltimore City. After taking note of a man carrying a satchel in the vicinity of an Exxon station, the officers saw the man notice them. The man, to whom we will refer as John Doe,[2] then started running and tossed the satchel into a dumpster. O'Sullivan recovered the abandoned satchel and discovered a gun inside it. The officers arrested Doe at the Exxon station, which is approximately one block away from the Apartments in the 5600 block of The Alameda. After his arrest, Doe told O'Sullivan that "a black male

---

[2] The name of this man is not contained in the record.

11

wearing jeans, a white T-shirt, a red thermal and red shoes" was at the Apartments, carrying a gun. Streett, O'Sullivan, and several other officers proceeded to the Apartments to attempt to apprehend the individual described by Doe.

The Apartments consist of two parallel rows of townhomes separated by a courtyard.[3] To the west of the courtyard, and at a lower elevation than the courtyard, is a surface parking lot. The courtyard can be reached from the west surface lot by ascending two sets of steps, separated by a landing, or by walking up a dirt path alongside the steps. To the east of the courtyard is another surface lot. Just to the south of the apartment complex is an alley running from east to west. The alley is separated from the southern portion of the apartment complex by a chain-link fence and, close to where the alley abuts the Apartments' east surface lot, a tall wooden fence.

On May 1, 2018, if one walked through the courtyard from west to east and turned right at the end of the row of townhomes on the south side of the complex, a few steps later one would come upon a stairwell leading down to a basement landing. The stairwell was enclosed on one side by the outer wall of the townhomes and, on the opposite side, by a tall wooden fence.

At trial, the State played Streett's body-worn camera footage as she provided a running narrative.[4] The State also played O'Sullivan's body-worn camera footage. The

---

[3] We have included as an Appendix to this opinion an aerial view of the Apartments and surrounding area, which the State introduced as State's Exhibit 3 at O'Sullivan's trial.

[4] Baltimore Police Department officers are required to activate their body-worn cameras from standby mode when beginning an investigation. Activation of the camera restores the previous 30 seconds of captured footage, albeit without sound.

video footage and Streett's testimony established that, after they arrived at the Apartments, Streett and O'Sullivan parked in the west surface lot, exited their vehicle, and approached the courtyard on foot. Streett and O'Sullivan were both in uniform. Meanwhile, other officers had positioned themselves in the adjacent alley, based on the officers' expectation that, if there was an individual present with a gun, he might attempt to flee by way of the alley after Streett and O'Sullivan made their presence known.

O'Sullivan walked from the parking lot to the courtyard using the paved steps, while Streett took the dirt path on O'Sullivan's right. As she walked up the hill, with O'Sullivan to her left making his way up the steps, Streett could not see over the crest of the sidewalk toward the proximate corner of the most distant townhome on the south side of the complex, a corner where criminal activity frequently occurred. When the officers neared the top of the hill, O'Sullivan smiled and greeted two children sitting on the top of the stairs. Once she reached a point where she could see through the courtyard to the back corner of the townhomes on the south side of the complex, Streett saw nothing concerning; rather, she only saw individuals on the porches in front of their townhomes.

O'Sullivan and Streett proceeded through the courtyard, and the officers were never separated by more than 10 to 15 feet. It took the officers approximately 30 seconds to cross the courtyard. During that time, O'Sullivan said nothing to Streett about seeing anyone throw something or take flight.

As the officers neared the proximate corner of the most distant townhome on the south side of the complex, Streett activated her body-worn camera on the basis that, given the criminal activity that regularly occurred near that location, she was "initiating an

13

investigation." As the officers turned right at the corner and approached the stairwell, Streett observed a man (later identified as Smith) in the alley running from east to west. At first, Smith was obscured from Streett's view by the wooden fence separating the eastern part of the alley from the yard of the apartment complex, but as Smith continued to run west through the alley, he came into Streett's view. Other officers pursued Smith and at least one other man as they ran west through the alley.

After Streett and O'Sullivan saw Smith and the other man running through the alley, O'Sullivan proceeded down the stairs to the basement landing, shining his flashlight into the stairwell. While O'Sullivan inspected the stairwell, Streett approached the alley. As she did so, she walked past a revolver lying in the grass two to three feet to the left of the wooden fence enclosing the stairwell.[5] With her attention focused on the chase taking place in the alley, Streett did not notice the gun as she walked past it. She then climbed over the chain-link fence into the alley, and made her way west down the alley, where Smith had been apprehended by officers. Smith was wearing a white t-shirt, jeans, and red and white sneakers. This was consistent with John Doe's description of the man carrying a firearm at the Apartments.

---

[5] During her testimony, Streett placed an "X" on State's Exhibit 3 to indicate the spot where the gun was recovered. *See* App. She also marked the spot where she and O'Sullivan parked when they first arrived (with a dot), the steps where O'Sullivan greeted the children before the officers entered the courtyard (with a triangular shaped mark), the spot where she first saw Smith and another man running in the alley (with two circles) and the direction they ran (with an arrow), and the spot where Smith was taken into custody (with a square). *See id.*

14

After he completed his inspection of the stairwell, O'Sullivan walked back up the steps. When he reached the top of the stairs, O'Sullivan turned right and then walked around the tall wooden fence that enclosed the stairwell, approaching the alley. At that point, O'Sullivan saw the black and silver handgun in the nearby grass, activated his body-worn camera, radioed "got the gun" to the other officers, and picked up the firearm. When O'Sullivan recovered the gun, it was in a spot that was at least 20 feet away from the corner of the building at which he and Streett had turned after walking through the courtyard and reaching the end of the south row of townhomes. A portion of the tall wooden fence enclosing the stairwell was in the direct line between the corner of the building and the spot where O'Sullivan recovered the gun. Thus, when O'Sullivan and Streett reached the corner of the building, the wooden fence completely blocked their view of the gun. It was only after O'Sullivan came back up the stairwell, walked around the wooden fence and proceeded toward the alley with the fence to his right, that he saw the gun.

After he picked up the revolver, O'Sullivan climbed over the chain-link fence between the apartment complex and the alley, and entered the alley. As he approached the spot where Streett and other officers were detaining Smith, O'Sullivan radioed "30," an indication that someone should be taken into custody.

Smith testified that he was at the Apartments that day to visit with his cousin and others. He admitted that he played dice and smoked marijuana with a group of people, but denied that he had a handgun. Smith claimed that he was around the corner of the rear apartment building when someone yelled "police," after which he and the others playing dice scattered. Smith testified that, prior to the moment when the group scattered, he had

15

been standing around the corner of the building with his back to the corner of the building. According to Smith, he was in that spot for approximately five minutes before someone yelled "police." In other words, for approximately five minutes prior to the time Smith fled, Smith was not in a position where he could be seen by someone on the landing between the west surface parking lot and the second set of steps leading to the courtyard or by someone who was approaching the rear corner of the south row of townhomes from the west, by way of the courtyard.

The State asked Smith to specify what O'Sullivan testified to at Smith's District Court trial that was "inconsistent with the truth." Smith replied: "He said that he saw me with a silver handgun and I removed it from my waistband and threw it on the ground and that was not true."[6]

Testifying in his own defense, O'Sullivan stated that, as he walked on the landing between the two sets of steps prior to entering the courtyard, he could see through the courtyard to the corner of the rear townhome in the south row of townhomes. At that time, according to O'Sullivan, he saw the man later identified as Smith standing next to the corner of the rear townhome, facing O'Sullivan. Smith was standing next to the man subsequently identified as Cozart. O'Sullivan testified that he then saw Cozart flee eastbound through the east surface parking lot. According to O'Sullivan, at that same time, he saw Smith turn and also begin to run. O'Sullivan further testified that, as Smith turned away from him to flee, Smith reached into his waistband and tossed an object.

---

[6] In its case-in-chief, the State also played an audio recording of O'Sullivan's testimony at Smith's trial.

16

After the close of evidence, and after hearing argument from the State and O'Sullivan's trial counsel, the circuit court ruled as follows:

> [T]he issue is whether … [O'Sullivan] was telling the truth on the statement of charges [and] in his testimony in front of the district court, and this Court finds that the detective did not tell the truth.
>
> I sat and watched the body camera video of Sergeant Streett and the observations from that body camera of what was possibly the vision of two individuals approaching that area, and I took into great consideration that Officer O'Sullivan had a different angle, a different perspective in his testimony of what he saw of Mr. Smith being at the side of the building and discharging or … tossing.
>
> Today what he said was it was an object that – under oath he said it was a gun and numerous times he was positive that it was a gun. The gun was found so far away that it could not have been tossed. It had to go around the corner, basically over a fence and that to me is inconsistent with the testimony of Sergeant Streett, the video, body-worn camera video, the testimony of all the other officers who didn't observe any of it.
>
> His lack of turning on his video, his stopping and talking with some kids when allegedly suspects are running off, his not even mentioning to his partner who was right beside him the possibility of something being tossed, I found the testimony of Detective O'Sullivan to be challenged and I find that his statements in district court, he perjured himself on direct examination from the State's attorney and from cross examination of the Defense attorney.
>
> So this Court finds beyond a reasonable doubt that the Defendant is guilty of both perjury and misconduct in office.

On December 3, 2019, the circuit court sentenced O'Sullivan to concurrent 15-month terms of incarceration on the two counts of conviction.

## C. Appeal

O'Sullivan noted a timely appeal, presenting the Court of Special Appeals with the sole question of whether the evidence introduced at trial was legally sufficient to sustain

his perjury and misconduct in office convictions. In an unreported opinion, the Court of Special Appeals affirmed the judgment of the circuit court. The intermediate appellate court held that, "because a reasonable factfinder could conclude that O'Sullivan testified falsely at Smith's criminal trial based solely on the body camera footage, this was not an oath-against-oath case implicating the two-witness rule." *O'Sullivan v. State*, No. 2275, slip op. at 17, Sept. Term, 2019, 2020 WL 7419686, at *8 (Md. Ct. Spec. App. Dec. 18, 2020). The court also held that, even if it were to apply the two-witness rule, the rule would be satisfied because Streett's body camera footage was independent corroborative evidence of Smith's testimony, and because "the direct and circumstantial evidence was legally sufficient to foreclose any reasonable hypothesis other than O'Sullivan's guilt." *Id.*

O'Sullivan filed a petition for *certiorari* in this Court, seeking review of the following questions:

1. Whether, in an oath-against-oath perjury case, the State is relieved of its burden of production under the two-witness rule by introducing circumstantial evidence?

2. Whether there was sufficient evidence that [O'Sullivan] committed perjury and misconduct in office?

The State subsequently filed a conditional cross-petition for *certiorari*, presenting the following question:

Should the "two witness" rule, which provides for a heightened burden of production that is only applicable to the misdemeanor offense of perjury, be prospectively abrogated in favor of the standard burden of production in a criminal case, which requires the State to prove guilt beyond a reasonable doubt and trusts in the ability of the fact-finder to weigh evidence?

18

On April 9, 2021, we granted both petitions. *O'Sullivan v. State*, 474 Md. 221 (2021).

## II

### Standard of Review

Maryland Rule 8-131(c) governs the appellate review of nonjury trials:

> When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.

In reviewing the sufficiency of the evidence, "Maryland appellate courts ... adopt a deferential standard ... that asks whether '*any* rational trier of fact could have found the elements of the crime beyond a reasonable doubt.'" *McGagh*, 472 Md. at 193 (emphasis in original) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). An appellate court's only question, in reviewing sufficiency, is "whether the verdict was supported by sufficient evidence, direct or circumstantial, which could fairly convince a trier of fact of the defendant's guilt of the offenses charged beyond a reasonable doubt." *State v. Manion*, 442 Md. 419, 431 (2015) (internal quotation marks and citation omitted). "Weighing the credibility of witnesses and resolving any conflicts in the evidence are tasks proper for the fact finder," *State v. Smith*, 374 Md. 527, 533-34 (2003) (internal quotation marks and citation omitted), and, upon review, the evidence must be viewed "in the light most favorable to the prosecution." *Id.* at 533.

We review questions of law *de novo*. *State v. Robertson*, 463 Md. 342, 358 (2019).

19

# III

## Discussion

### A. Maryland Shall Retain the Two-Witness Rule.

We first consider the State's cross-petition, in which the State asks us to prospectively abrogate the two-witness rule. Because doing so would be inconsistent with the doctrine of *stare decisis*, we shall retain the rule.

"Under *stare decisis*, absent extremely narrow exceptions, an appellate court does not overrule its precedent." *Thompson v. UBS Fin. Servs., Inc.*, 443 Md. 47, 57 (2015) (cleaned up). While "*stare decisis* does not preclude this Court from changing a common law rule where, in light of changed conditions or increased knowledge," a rule "has become unsound in the circumstances of modern life" and "a vestige of the past," *State v. Wiegmann*, 350 Md. 585, 604 (1998) (cleaned up), there are only two exceptions to the general rule that could potentially apply here. "First, the Court may strike down a decision that is clearly wrong and contrary to established principles." *Wallace v. State*, 452 Md. 558, 582 (2017) (cleaned up). "Second, precedent may be overruled when there is a showing that the precedent has been superseded by significant changes in the law or facts." *Id.* (internal quotation marks and citation omitted). Outside of these exceptions, to abide by *stare decisis* "is the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." *Livesay v. Baltimore Cty.*, 384 Md. 1, 14 (2004) (quoting *Payne v. Tennessee*, 501 U.S. 808, 827 (1991)).

20

Neither of these exceptions applies with respect to the two-witness rule. Analyzing the federal version of the rule more than 70 years ago, the Supreme Court observed that, "[w]hether it logically fits into our testimonial pattern or not, the government has not advanced sufficiently cogent reasons ... to reject the rule." *Weiler v. United States*, 323 U.S. 606, 609 (1945). The same holds true with respect to the State's arguments here.

1. <u>The Two-Witness Rule Is Not Clearly Wrong and Contrary to Established Principles.</u>

The Supreme Court articulated the modern rationale[7] for the rule in *Weiler*:

> Lawsuits frequently engender in defeated litigants sharp resentments and hostilities against adverse witnesses, and it is argued, not without persuasiveness, that rules of law must be so fashioned as to protect honest witnesses from hasty and spiteful retaliation in the form of unfounded perjury prosecutions.

> The crucial role of witnesses compelled to testify in trials at law has impelled the law to grant them special considerations. In order that witnesses may be free to testify willingly, the law has traditionally afforded them the protection of certain privileges, such as, for example, immunity from suits for libel springing from their testimony. Since equally honest witnesses may well have differing recollections of the same event, we cannot reject as wholly unreasonable the notion that a conviction for perjury ought not to rest entirely upon "an oath against an oath." The rule may originally have stemmed from quite different reasoning, but implicit in its evolution and continued vitality has been the fear that innocent witnesses might be unduly harassed or convicted in perjury prosecutions if a less stringent rule were adopted.

*Weiler*, 323 U.S. at 609 (footnote omitted). The modern purpose of the two-witness rule, then, is not only to prevent the wrongful conviction of purported perjurers, but also to deter their being wrongly prosecuted at all.

---

[7] The parties agree – as do we – that the quantitative approach of the ancient ecclesiastical courts, from which the two-witness rule originally developed, provides no justification for the rule today. It would be bizarre to suggest otherwise.

As discussed above, in *McGagh* we stated that the "logical underpinnings" of the two-witness rule "remain sound." 472 Md. at 199 n.14. However, in *McGagh*, the State did not seek the abrogation of the two-witness rule. In this case, the State makes several arguments in support of its position that the logical underpinnings of the rule are not sound. First, the State argues that, while the two-witness rule ostensibly serves as protection against wrongful convictions, "by affording such extra protection *only* to those who have been charged with giving false testimony, the rule potentially licenses the very harm it seeks to avoid." This concern seems overblown, given the relatively modest burden that the two-witness rule imposes on the State. All the State must do to meet its burden of production under the rule is introduce some evidence – direct and/or circumstantial – that (in addition to a witness's direct and positive testimony) tends to prove the defendant's prior testimony was false. As discussed further below, once the State meets this burden of production, it is the factfinder's task to determine whether the State's proof as a whole establishes the falsity of the defendant's prior testimony (and the other elements of perjury) beyond a reasonable doubt. A reasonable witness would not feel emboldened by the two-witness rule to testify falsely, as the State likely will be able to produce some other evidence of falsity in addition to the direct and positive testimony of a witness who asserts that the defendant's prior testimony was false. It is telling that, despite Maryland having maintained the two-witness rule for more than two centuries, the State has provided us with no empirical or anecdotal evidence that perjury occurs more frequently in Maryland than in states that have dispensed with the rule.

Although we doubt that the two-witness rule encourages perjury, we think the rule does encourage a reasonable, *truthful* witness – who otherwise might be reluctant to testify out of fear that she may not be believed – to provide testimony. It does so by requiring the State to have more than just one person's uncorroborated contrary account to successfully prosecute the witness for perjury. This gives the truthful witness confidence that, if the factfinder does not accept the witness' testimony, the State will not proceed against the witness on a perjury charge based solely on a "he said/she said" dispute.

Second, the State argues that the modern justification for the two-witness rule incorrectly assumes that there is a relatively greater likelihood of unfounded accusations of perjury than there is for other crimes. In support of this contention, the State relies upon *Hourie I*'s assertions that "fear [of retaliatory prosecution] now seems illusory" and that "[t]he institutionalization of the charging mechanism in America, as opposed to the private prosecution of crime that was for long permitted in England, effectively forestalls the danger of reckless charging." *Hourie I*, 53 Md. App. at 83. However, this criticism of the two-witness rule does not convince us that the rule is clearly wrong. Perjury prosecutions do differ from other prosecutions, in that a perjury charge concerns a defendant's prior sworn statement, often given to the detriment of the prosecution in a prior case. In such a case, a prosecution for perjury resembles a private prosecution. *McGagh* observed that perjurers harm not only the people of the state writ large, and not only those individuals who may be wrongfully charged or convicted on the basis of their testimony, but also the

justice system itself.[8] The individuals who make the decisions to investigate, charge, and arrest are at the heart of that system. Thus, alleged perjurers may be perceived as wasting the time and energy of the very people responsible for deciding whether to prosecute them for perjury. Even where perjury occurs in a civil case as opposed to a criminal case, the prosecutor becomes the defender of the administration of justice in such a case by virtue of the existence of criminal penalties for perjury in civil cases.

Although most prosecutors undoubtedly strive to maintain objectivity when considering whether to pursue a perjury case, we cannot say that the two-witness rule is a wholly unnecessary check against a prosecutor potentially losing objectivity and bringing an unfounded perjury case based on the word of a single witness who claims that the putative defendant testified falsely.

Third, the State contends that maintaining the two-witness rule is not justified by the concern that equally honest witnesses may have differing recollections of the same event, "because falsity (the only element to which the rule applies) is only one element of the criminal offense of perjury. It is thus not sufficient to prove the testimony was factually untrue (*i.e.* false)." Rather, the State reminds us, it must also prove that the defendant acted "willfully" in providing the false testimony, Md. Code, Crim. Law (CR) § 9-101(a) (Repl.

---

[8] *See McGagh*, 472 Md. at 198 ("[T]he trial court identified multiple instances where McGagh's false statements harmed the justice system. The false accusation pulled [a police officer] away from his other law enforcement duties to investigate her specious claim. It occupied the attention of [a] Commissioner in evaluating and issuing the arrest warrant. It wasted the time of the officers who arrested [the employee who allegedly assaulted McGagh]. It consumed the time of the trial court in litigating her claim.").

24

Vol. 2021); that is, that "the false oath [was] deliberate and not the result of surprise, confusion or bona fide mistake." *McGagh*, 472 Md. at 204 (cleaned up).

We recognize that the two-witness rule is not the only safeguard against a wrongful perjury conviction. The requirement that the State prove the element of willfulness is also significant. However, once the State sufficiently proves falsity, it often is a small leap from that point to prove willfulness. Indeed, it has long been accepted that the trier of fact in a perjury case may infer willfulness from the proof of falsity itself. *See, e.g.*, *McGagh*, 472 Md. at 204 ("Proof of falsity permits a trial court's inferences of wrongful intent."); *State v. Boratto*, 404 A.2d 604, 608 (N.J. 1979) (knowledge of falsity in a prosecution for perjury may be inferred from surrounding circumstances, including "the objective falsity itself"); *State v. McCaslin*, 482 N.W.2d 558, 564 (Neb. 1992) ("Proof of the falsity of a response may circumstantially imply knowledge that such was untrue when uttered."); *La Placa v. United States*, 354 F.2d 56, 59 (1st Cir. 1965) (holding that "appellant's belief that the statements he made were false need not be proved by the 'two witness rule;' and that in appropriate circumstances belief of falsity may be inferred by proof of the falsity itself"). This principle makes it easier for the State to prove willfulness in a perjury case. But it is sound only if one is confident that the State has sufficiently proven the element of falsity. Because proof of falsity and proof of willfulness often are coextensive, or at least intertwined, the willfulness element does not carry the weight that the State ascribes to it here. But even if we assume that the State often will be able to point to additional evidence besides the proof of falsity to establish the element of willfulness, we cannot say it is clearly

wrong to provide a second check against a wrongful perjury conviction in the form of the two-witness rule.

We gather that the State seeks to abrogate the two-witness rule because it would like to have the freedom and flexibility to bring a perjury case in the seemingly rare situation where, after an investigation, the only proof of falsity it has is the word of a single witness. It is true that the two-witness rule constrains the State's prosecutorial discretion in such a case. However, this burden does not justify a "departure from the established rules of law." *Loeffler v. Carey*, 181 Md. 648, 652 (1943).

   2.   The Rule Has Not Been Superseded by Changes in the Law or Facts.

The State identifies no changed factual circumstances in the 60 years since this Court first analyzed and recognized the two-witness rule in *Brown* that would justify abandoning it. Indeed, the two-witness rule appears to be thriving nationwide, growing, rather than shrinking, in its applicability. While five states have statutorily abrogated the rule[9] and one state high court has declined to adopt it,[10] no state high court has explicitly

---

[9] *See* Alaska Stat. § 11.56.220 (2021); Ariz. Rev. Stat. Ann. § 13-2707 (2021); N.D. Cent. Code § 12.1-11-01(2) (2021); Okla. Stat. Ann. tit. 21, § 498(a) (2021); 11 R.I. Gen. Laws § 11-33-1(e) (2021).

[10] *See State v. Sands*, 467 A.2d 202, 214 (N.H. 1983).

abrogated the rule,[11] and 16 states have codified it.[12] This case, then, is not like *State v. Jones*, in which this Court abrogated the accomplice corroboration rule at a time when "most jurisdictions (thirty-two states, the District of Columbia, the federal courts, Puerto Rico, Guam, and the Virgin Islands) either [had] not adopted the ... rule or [had] repealed it." 466 Md. 142, 160 (2019) (footnote omitted). Indeed, when this Court decided *Jones*, "Maryland and Tennessee [were] the only jurisdictions with a judicially-created accomplice corroboration rule." *Id.* at 160-61.

Still, the State identifies one potential change in the law that could support abrogation. The State notes that, in 1970, the Supreme Court held "that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). This was nine years after this Court first discussed the two-witness rule in *Brown*, and 25 years after the Supreme Court preserved the two-witness

---

[11] In *State v. Storey*, 182 N.W. 613, 615 (Minn. 1921), the Minnesota Supreme Court held that "perjury may be proved by circumstantial evidence [alone] if proof is made beyond reasonable doubt, as in the case of other crimes." The *Storey* Court was not "primarily concerned with the question whether the direct testimony of one witness without more will sustain a conviction, for in [Storey's] case there was no direct testimony of the falsity of the oath. The evidence was circumstantial." *Id.* at 614-15.

[12] *See* Ala. Code § 13A-10-105 (2021); Ark. Code Ann. § 5-53-107 (2021); Cal. Penal Code § 118(b) (2021); Del. Code Ann. tit. 11, § 1234 (2021); Haw. Rev. Stat. § 710-1067 (2021); Ky. Rev. Stat. Ann. § 523.060 (2021); Mo. Rev. Stat. § 575.070 (2021); Mont. Code Ann. § 45-7-201(7) (2021); Neb. Rev. Stat. § 28-915(7) (2021); N.J. Stat. Ann. § 2C:28-1(e) (2021); N.Y. Penal Law § 210.50 (McKinney 2021); Ohio Rev. Code Ann. § 2921.11(E) (2021); Or. Rev. Stat. § 162.115 (2021); 18 Pa. Cons. Stat. § 4902(f) (2021); Tex. Code Crim. Proc. Ann. art. 38.18(a) (West 2021); Utah Code Ann. § 76-8-505(1) (2021).

rule at the federal level and articulated its modern policy justification in *Weiler*. Arguably, the justification for a burden of production unique to perjury and unknown to any other crime (with the exception of treason) is undermined by the universal guarantee of this burden of proof, one of the most stringent safeguards afforded criminal defendants, and one that is "basic in our law and rightly one of the boasts of a free society[.]" *Leland v. Oregon*, 343 U.S. 790, 803 (1952) (Frankfurter, J., dissenting).

Yet, the *Winship* Court itself identified multiple Supreme Court opinions indicating that, by 1970, "it [had] long been assumed that proof of a criminal charge beyond a reasonable doubt [was] constitutionally required." 397 U.S. at 362. In Maryland, at least by the 1870s, proof "beyond a reasonable doubt" was accepted as the relevant standard in a criminal case. *See, e.g., Norwood v. State*, 45 Md. 68, 75 (1876) (stating that "[t]he *corpus delicti* must be found beyond reasonable doubt"). Notwithstanding prior practice in Maryland under which trial courts instructed juries that, consistent with Article 23 of the Maryland Declaration of Rights,[13] the jurors were the judges of the law in addition to being the judges of the facts,[14] the reasonable doubt standard was firmly entrenched in Maryland by 1961, when this Court judicially recognized the two-witness rule in *Brown*. *See, e.g.*, *Johnson v. State*, 227 Md. 159, 163 (1961) ("Everyone accused of crime is presumed to be innocent; and, in order to justify a finding of guilt, it is incumbent upon the State

---

[13] Article 23 of the Maryland Declaration of Rights provides, in part: "In the trial of all criminal cases, the Jury shall be the Judges of Law, as well as of fact, except that the Court may pass upon the sufficiency of the evidence to sustain a conviction."

[14] For a discussion of this practice, see *Stevenson v. State*, 289 Md. 167 (1980), *overruled by Unger v. State*, 427 Md. 383 (2012).

affirmatively to establish the defendant's guilt beyond a reasonable doubt."). Thus, the State's invocation of *Winship* as a changed circumstance that should cause us to abrogate the two-witness rule is unavailing.

To conclude, we reaffirm what we said about the two-witness rule in *McGagh*: its "logical underpinnings remain sound." 472 Md. at 199 n.14. Nor do we perceive any changed circumstances that warrant the rule's abrogation. For these reasons, we shall retain the two-witness rule in Maryland.

**B. Evaluation of the Sufficiency of the Evidence in a Perjury Case**

As discussed above, the two-witness rule is a burden of production that applies if the State elects to present the testimony of a witness as "direct and positive" evidence of the element of falsity. However, the State need not prove falsity in a perjury case through the testimony of a witness who directly contradicts the truth of the alleged perjurious statement. Rather, the State may prove falsity by producing "evidence of a different kind." *Hourie II*, 298 Md. at 61 (internal quotation marks and citation omitted). For example, the State may prove falsity entirely through circumstantial evidence, as it did in *Brown* and *Smith*. In such a case – which does not involve "oath-against-oath" – the two-witness rule has no application. It is clear that, in reviewing the sufficiency of the evidence of falsity (and the other elements of a perjury charge) in a case where the two-witness rule is inapplicable, an appellate court applies the same standard of review as it does in all other criminal cases that do not include perjury charges. That is, the appellate court asks whether

29

"*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Manion*, 442 Md. at 430 (emphasis in original) (citations omitted).

O'Sullivan argues that, because Smith did provide direct evidence of falsity at O'Sullivan's trial, the two-witness rule applies to this case, and we must therefore review the sufficiency of the evidence using a unique three-part test, which focuses on the circumstantial evidence the State offered to corroborate Smith's testimony as to the element of falsity. Relying on *Mason v. State* for this test, O'Sullivan argues that, first, the circumstantial evidence "must be 'independent,' meaning that it must come 'from a source other than that of the direct testimony.'" Pet. Br. at 23 (quoting *Mason*, 225 Md. App. at 486). Second, the evidence must be "sufficiently corroborative" of the direct testimony – *i.e.*, it must "tend[] to substantiate that part of the testimony of the principal prosecution witness, which is material in showing that the statement made by the accused under oath was false." *Mason*, 225 Md. App. at 487. Third, the evidence must be "of such a nature so as to be of equal weight to that of at least a second witness, thus foreclosing any reasonable hypothesis other than the defendant's guilt." *Id.* at 488 (quoting *Brown*, 225 Md. at 616-17).

The Court of Special Appeals opined that "a reasonable factfinder could conclude that Officer O'Sullivan testified falsely at Smith's criminal trial based solely on the body camera footage[.]" *O'Sullivan*, slip op. at 17, 2020 WL 7419686, at *8. That being the case, the court stated that "this was not an oath-against-oath case implicating the two-witness rule." *Id.* We agree with O'Sullivan that the two-witness rule does apply to his prosecution. Whether or not the State could have proved the element of falsity without calling Smith as

30

a witness, the State did not proceed that way. Because the State chose to introduce Smith's direct and positive testimony to establish the element of falsity, the two-witness rule was applicable, and the State was required to produce additional evidence that tended to prove the falsity of O'Sullivan's prior testimony.

However, we disagree with O'Sullivan's contention that a different standard of review should apply with respect to the sufficiency of the evidence of falsity in an "oath-against-oath" perjury case versus a perjury case in which the two-witness rule is inapplicable. Prior cases discussing the relaxed two-witness rule have conflated the rule's burden of production with the State's burden of persuasion in proving falsity beyond a reasonable doubt, resulting in confusion. Most notably, in *Brown*, this Court stated that, if the State attempts to prove falsity in a perjury case through the use of direct testimony from a single witness and corroborating circumstantial evidence, the latter must be "of such a nature so as to be of equal weight to that of at least a second witness, thus foreclosing any reasonable hypothesis other than the defendant's guilt." *Brown*, 225 Md. at 616-17.

We find this formulation, ultimately, to be unhelpful. The State always has the burden to prove all elements of a criminal charge beyond a reasonable doubt. As we have explained, the two-witness rule prohibits the State from proving falsity in a perjury case solely through direct and positive evidence from a single witness. Beyond that limitation, the State may proceed as it sees fit. It may attempt to meet its burden to prove falsity through direct and positive testimony from at least two witnesses; or entirely through circumstantial evidence; or through a combination of direct witness testimony and circumstantial evidence. How the State chooses to attempt to meet its burden of persuasion

31

as to falsity in any particular case does not affect the standard of review that a court applies in determining whether the State has met that burden. Thus, circumstantial evidence in an oath-against-oath perjury case need not be equal to the conceptual "weight" of a second witness. This abstract proposition suggests that the reviewing court should compare the weight of the direct witness testimony against the weight of the other evidence. That inquiry is not necessary or appropriate. Rather, where the State introduces direct and positive testimony from a single witness as well as circumstantial evidence to prove falsity, a reviewing court should examine the totality of the evidence, as it does in every other case. Again, under that standard of review, the court asks whether "*any* rational trier of fact could have found the elements of the crime beyond a reasonable doubt," *McGagh*, 472 Md. at 193 (emphasis in original) (quoting *Jackson*, 443 U.S. at 319), with the evidence presented at trial viewed in the light most favorable to the State.[15]

## C. O'Sullivan's Convictions for Perjury and Misconduct in Office

With the principles we have discussed above in mind, we now review O'Sullivan's convictions for perjury and misconduct in office. We conclude that the State met its burden

---

[15] O'Sullivan also contends that proof of falsity by circumstantial evidence is permissible only where that evidence is documentary in nature. He is incorrect. Certainly, circumstantial evidence that goes to the element of falsity often comes in the form of documents. In days of yore, such circumstantial evidence sometimes could only be documentary in nature, given the technology that existed at the time. *See, e.g.*, *United States v. Wood*, 39 U.S. 430, 440 (1840) ("[C]ircumstances, without any witness, when they exist in *documentary or written testimony*, may combine to establish the charge of perjury[.]") (emphasis added). In *McGagh*, we recognized that evidence of falsity today comes in multiple forms, including "documents, video footage, or other circumstantial evidence." 472 Md. at 199 n.14.

of production under the two-witness rule, as well as its burden to persuade the trier of fact beyond a reasonable doubt that O'Sullivan was guilty of the charged offenses.

1.  The State Met Its Burden of Production Under the Two-Witness Rule.

The State introduced more than the direct and positive testimony of a single witness to prove the falsity element of perjury at O'Sullivan's trial. In addition to Smith's direct testimony, the State introduced video evidence, informed by Sergeant Streett's testimony, which tended to prove that O'Sullivan could not have seen Smith throw a firearm where and when O'Sullivan claimed Smith did so. Thus, the State met its burden of production under the two-witness rule.

2.  The Evidence Was Sufficient to Prove That O'Sullivan Committed Perjury and Misconduct in Office.

Under the perjury statute that applies to O'Sullivan's prosecution, CR § 9-101(a)(1), "[a] person may not willfully and falsely make an oath or affirmation as to a material fact ... if the false swearing is perjury at common law." At common law, perjury was "the wilful [*sic*] giving of a false oath (a corrupt sworn statement made without sincere belief in its truthfulness) in a judicial proceeding in regard to a material matter." *McGarvey v. McGarvey*, 286 Md. 19, 25 (1979). False testimony is "material" when it is "capable of affecting the course or outcome of the proceedings or the decision-making of the court[.]" *McGagh*, 472 Md. at 206 (emphasis, internal quotation marks, and citation omitted). False testimony is "willful" when it is deliberate, and not the result of "surprise, confusion or bona fide mistake[.]" *State v. Devers*, 260 Md. 360, 372 (1971), *overruled on other grounds*, *In re Petition for Writ of Prohibition*, 312 Md. 280 (1988). As discussed above,

33

"[p]roof of falsity permits a trial court's inferences of wrongful intent." *McGagh*, 472 Md. at 204.

Misconduct in office is a common law misdemeanor entailing "corrupt behavior by a public officer in the exercise of the duties of his office or while acting under color of his office." *Duncan v. State*, 282 Md. 385, 387 (1978). The public officer's "corrupt behavior may be (1) the doing of an act which is wrongful in itself – malfeasance[;] or, (2) the doing of an act otherwise lawful in a wrongful manner – misfeasance; or, (3) the omitting to do an act which is required by the duties of the office – nonfeasance." *Id.*

O'Sullivan contends the evidence at trial showed that "it was entirely possible for Smith to have been standing where [O'Sullivan] testified [Smith was at the time Smith allegedly threw a gun] and for the gun … to have landed where it did." That being the case, O'Sullivan argues that the trial court's verdict was based on "mere speculation or conjecture," *Smith v. State*, 415 Md. 174, 185 (2010), and that its reasoning therefore was "obviously insufficient," *Taylor v. State*, 346 Md. 452, 458 (1997) (citation omitted). O'Sullivan also argues that, even if the evidence was sufficient to support the trial court's finding that he testified falsely, it was insufficient to support a finding that any false testimony was willful. In regard to the former point, the State counters that O'Sullivan's arguments pertaining to his point of view and the physics of the gun's potential landing spot go to the weight of the evidence and therefore implicate issues that are within the province of the factfinder. With respect to the latter point, the State responds that proof of falsity permits, but does not require, a trial court's inference of wrongful intent, and that the trial court here, rather than finding O'Sullivan saw Smith throw something that was not

a gun, found that O'Sullivan did not see Smith throw anything at all. Based on this finding, the State argues, the trial court reasonably could find that O'Sullivan's testimony at Smith's trial was not mistakenly inaccurate, but rather was willfully false.

The State is correct on both counts. First, the trial court's inferences from the body-worn camera footage regarding what O'Sullivan could or could not see as he crested the hill from the west surface lot, and whether the gun could have landed where it did from where Smith allegedly threw it, are not based on speculation or conjecture, but are plainly supported by the record. Pages 31, 41, and 42 of O'Sullivan's opening brief contain photographs extracted from body-worn camera footage depicting the geography and architecture of the rear corner of the easternmost townhome near which O'Sullivan found the gun. These photographs show that the trial court's finding regarding the flight path of the gun is not clearly erroneous. Given the tall wooden fence between the corner of the building and the spot where O'Sullivan recovered the gun, it was highly unlikely, if not physically impossible, for someone standing where O'Sullivan claimed Smith was standing to have thrown the gun.

Nor is the trial court's drawing an inference that O'Sullivan did not see anything thrown from his "lack of turning on his video, his stopping and talking with some kids when allegedly suspects are running off, [and] his not even mentioning to his partner who was right beside him the possibility of something being tossed," clearly erroneous or based on mere speculation or conjecture. For O'Sullivan's testimony regarding Smith's having thrown a gun to be accurate, he would have had to watch a gun being thrown in a high-crime area, then fail to mention that to his supervisor or radio nearby police officers,

35

then calmly greet the two children at the top of the hill, and then walk all the way through the Apartments' courtyard before taking any action consistent with his having seen the gun being thrown. In addition, Streett, who accompanied O'Sullivan closely up the hill from the west lot and through the courtyard, testified that she saw nothing suspicious, despite being prepared to investigate criminal activity at the proximate corner of the easternmost townhome.

A rational trier of fact could find that these circumstances are inconsistent with O'Sullivan having testified truthfully at Smith's trial. Bearing in mind that "[w]eighing the credibility of witnesses and resolving any conflicts in the evidence are tasks proper for the fact finder," *State v. Stanley*, 351 Md. 733, 750 (1998), and, viewing the evidence in the light most favorable to the prosecution, *see, e.g., State v. Morrison*, 470 Md. 86, 105 (2020), a rational factfinder could find beyond a reasonable doubt that O'Sullivan's testimony was false, based on the body-worn camera footage, Streett's testimony, and Smith's testimony concerning his location prior to the time someone yelled "police" and he started running.[16]

---

[16] The defense impeached Smith effectively by playing a recording of a jailhouse call from which the court could have concluded that Smith possessed a gun at the Apartments that afternoon. Regardless, a rational trier of fact could have credited the portion of Smith's testimony in which he described his position for the five minutes prior to someone yelling "police" and the crowd then scattering. According to Smith, he was around the corner of the easternmost townhome during that period of time. Based on this testimony, a rational trier of fact could have concluded that Smith was not visible to O'Sullivan and Streett as they ascended the hill from the west parking lot and proceeded through the courtyard.

A rational trier of fact also could infer wrongful intent from the State's evidence proving falsity. As stated above, perjury is willful when the pertinent testimony is not the result of "surprise, confusion or bona fide mistake." *Devers*, 260 Md. at 372. Here, the circuit court discredited the very "possibility of something being tossed." For the reasons stated above, this was a rational inference from the available evidence. If O'Sullivan did not see anything being tossed, then the trial court could conclude that O'Sullivan did not testify falsely as a result of confusion or bona fide mistake.

As to the materiality element of perjury, as O'Sullivan was the only witness called by the State at Smith's trial, his testimony was plainly "capable of affecting the course or outcome of the proceedings or the decision-making of the court[.]" *McGagh*, 472 Md. at 206 (emphasis, internal quotation marks, and citation omitted). O'Sullivan makes no argument to the contrary.

Ultimately, a rational trier of fact could find beyond a reasonable doubt that O'Sullivan gave "a false oath in a judicial proceeding in regard to a material matter," *Hourie I*, 53 Md. App. at 64, that was not the result of "surprise, confusion or bona fide mistake." *Devers*, 260 Md. at 372. Thus, the evidence was sufficient to convict O'Sullivan of perjury.

The evidence also sufficiently supported the misconduct in office conviction. In proving that O'Sullivan perjured himself – that is, that he willfully provided false testimony – at the trial of a person he arrested, the State proved "corrupt behavior by a public officer in the exercise of the duties of his office or while acting under color of his office." *Duncan*, 282 Md. at 387.

"Requiring that the State prove corrupt intent in misfeasance cases shields public officers from liability for 'the consequences of mistakes honestly made.'" *Sewell v. State*, 239 Md. App. 571, 603 (2018) (quoting *Bevard v. Hoffman*, 18 Md. 479, 483 (1862)). Here, the evidence presented at trial not only permitted a reasonable factfinder to conclude that O'Sullivan testified falsely without surprise, confusion, or bona fide mistake, but also to determine that his conduct was driven by corrupt intent. If the evidence allowed for the determination that O'Sullivan's testimony was not error, and that it emerged not from confusion or surprise, but from a deliberate attempt to introduce falsehood, then there is no question that the purpose of the "corrupt intent" inquiry, that is, to avoid conviction for honest mistakes by public officials, has been satisfied.

## IV

### Conclusion

Maryland's common law will retain the two-witness rule for "oath-against-oath" perjury cases. Under the rule, the testimony of a single witness who testifies that the defendant's prior testimony was false cannot, by itself, satisfy the falsity element of a perjury charge. The State can prove falsity by introducing only circumstantial evidence, by introducing direct evidence from multiple witnesses, or by introducing circumstantial evidence along with direct evidence from one or more witnesses. Any such combination of forms of proof will satisfy the State's burden of production as to the element of falsity. The State met its burden of production under the two-witness rule in this case.

Appellate courts review the sufficiency of the evidence in an oath-against-oath perjury case as they do in any other case, asking whether any rational trier of fact could

find each element of perjury, including falsity, beyond a reasonable doubt. Here, the evidence was sufficient to sustain O'Sullivan's convictions for perjury and misconduct in office.

Accordingly, we affirm the judgment of the Court of Special Appeals.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; COSTS TO BE PAID BY PETITIONER.**

# APPENDIX



5600 The Alameda - Google Maps

5600 The Alameda

Imagery ©2019 Google, Map data ©2019 Google    20 ft

https://goo...om/maps/place/5600+The+Alameda,+Baltimore,+MD+21239/@39.3568714,-76.5... 7,90m/data=!3m1!1e3!4m5!3m4!1s0x89c805781401ed5b:0x129b9c6c3512cdff!8...  d39.35...    1/1

Circuit Court for Baltimore City
Case No. 119148010
Argued: September 13, 2021

IN THE COURT OF APPEALS

OF MARYLAND

No. 3

September Term, 2021

---

MICHAEL O'SULLIVAN

v.

STATE OF MARYLAND

---

Getty, C.J.
McDonald
Watts
Hotten
Booth
Biran
Raker, Irma S.
　　　(Senior Judge, Specially Assigned),

　　　JJ.

---

Concurring and Dissenting Opinion by Raker, J.,
which McDonald, J., joins.

---

Filed: December 17, 2021

Raker, J. concurring and dissenting, McDonald, J. joining.

I join in the judgment of the Court and agree that the evidence presented by the State was sufficient to support the judgment of conviction. I write separately because I would abrogate, prospectively only, the common law "two-witness rule" applicable to certain common law perjury prosecutions under CR § 9-101(a)(1), and instead would adopt the universal burden of production and persuasion applicable in all other criminal cases. Because the majority retains the "two-witness rule" for certain perjury cases,[1] I respectfully urge the General Assembly to review the rule and the outmoded reasons supporting it. [2]

It has been almost 40 years since Judge Charles E. Moylan, Jr., in *Hourie v. State*, 53 Md. App. 62 (1982), called for the abolition of the "two-witness rule" in perjury cases. His reasoning was persuasive then, and no less so today. Judge Moylan wrote "the two-witness rule is an alien from a long-dead world that was, during the English Civil War, accidentally caught in a time warp." *Id*. at 69. He said it perfectly, stating as follows:

> "The glaring invalidity of this 'oath versus an oath' *non sequitur* is clear to the modern mind. If there were vitality to the argument, we should have to adopt a two-witness rule for the prosecution of every crime, now that criminal defendants are competent to testify in their own defense. Whenever the single witness to a murder, rape, or robbery swears, 'He did it,' and the defendant swears, 'No, I didn't,' there is the old quantitative standoff of an oath versus an oath. This does not trouble us in the least. We overcome an oath (or even many

---

[1] Even if this Court characterizes the rule in Maryland as modified or revamped from its original iteration, it makes no sense to retain the rule as a unique exception to the general rule that evidence that is sufficient to convince the jury of the defendant's guilt beyond a reasonable doubt is sufficient to sustain a conviction.

[2] Other states have abrogated the rule by statute. *See, e.g.*, Ariz.Rev.Stat. § 13–2707 (1978).

oaths) with an oath all the time. The modern resolution to the problem of proof is to rely upon fact finders, in their unfettered discretion, to judge credibility and weigh evidence. We guard the liberty of the criminally accused not by some ancient and artificial burden of production but by allocating the burden of persuasion to the State and by establishing that burden at the 'beyond a reasonable doubt' level."

*Id.* at 78-80 (footnotes omitted).

Dean Wigmore, in rejecting the quantitative measurement of proof,[3] concluded as follows:

"What we must conclude, then, is that our whole presumption should be against any specific rule requiring a number of witnesses, or corroboration of a single witness; that such arbitrary measurements are likely to be of little real efficacy and to introduce disadvantages greater than those which they purport to avoid."

7 J. Wigmore, *Evidence* §§ 2030–2043 at 342 (Chadbourn rev. 1978).

Judge Moylan, embracing Wigmore in *Hourie,* explained as follows:

---

[3] In Dean Wigmore's view, the common law rejected the quantitative approach by the end of the sixteenth century, based on four general principles:
"The common law, then, in repudiating the numerical system, lays down four general principles:
(1) *Credibility does not depend on numbers of witnesses*. Therefore:
(2) In general, the testimony of a *single witness*, no matter what the issue or who the person, *may legally suffice as evidence upon which the jury may found a verdict*.
(3) Conversely, the *mere assertion of any witness* need not be believed, *even though he is unimpeached* in any manner, because to require such belief would be to give a quantitative and impersonal measure to testimony.
(4) As a corollary of the first proposition, *all rules requiring two witnesses*, or a *corroboration of one witness*, are exceptions to the general principle."
*Hourie v. State*, 53 Md. App. 62, 73-4 (1982) (quoting Wigmore) (emphasis in original). *See id*. at 74 for further explanation of "how. . .this single relic from the vanquished system survive[d]."

2

> "Under the general heading of 'Synthetic (or Quantitative) Rules,' Wigmore demonstrated meticulously that the civil law (including its English manifestations) was one where the 'process of proof rested fundamentally on a numerical system,' that the common law, by way of contrast, ultimately rejected that mode of proof in favor of 'the rational notion of analyzing and valuing testimony other than by numbers,' and that the single exception to the triumph of the qualitative over the quantitative analysis was truly of accidental origin. 'By the common law, there was but a single instance, and that a borrowed and modern one, of almost accidental and of anomalous origin (the rule in perjury), in which a numerical rule existed.'"

*Hourie*, 53 Md. App. at 69 (internal citations omitted).

Judge Moylan and Dean Wigmore were correct then and are correct today. Credibility does not depend upon the number of witnesses. Therefore, as jurors are commonly instructed, the weight of the evidence "does not depend on the number of witnesses on either side." MPJI–Cr 3:16. Thus, the testimony of a single witness, if it establishes the elements of an offense or cause of action, and if believed by the jury, may be sufficient to support a verdict.[4] *Handy v. State*, 201 Md. App. 521, 559 (2011); *N.B.S., Inc. v. Harvey*, 121 Md. App. 334, 342-3 (1998); *United States v. Osborne*, 886 F.3d 604,

---

[4] Although not abrogating the two-witness rule in federal courts, the United States Supreme Court, in *Weiler v. United States*, 323 U.S. 606, 608 (1945), observed as follows:
> "Our system of justice rests on the general assumption that the truth is not to be determined merely by the number of witnesses on each side of a controversy. In gauging the truth of conflicting evidence, a jury has no simple formulation of weights and measures upon which to rely. The touchstone is always credibility; the ultimate measure of testimonial worth is quality and not quantity. Triers of fact in our fact-finding tribunals are, with rare exceptions, free in the exercise of their honest judgment, to prefer the testimony of a single witness to that of many."

613 (6th Cir. 2018) (quoting *United States v. Washingto*n, 702 F.3d 886, 891 (6th Cir. 2012)); *People v. Smith*, 708 N.E.2d 365, 369 (Ill. 1999).

The United States Court of Appeals for the Fourth Circuit, in *Goins v. United States*, 99 F.2d 147, 149-50 (4th Cir. 1938), discussed the viability of the "two-witness rule" in the context of jury instructions and, in *dicta*, expressed strong doubt as to whether the rule made sense anymore (in 1938). The court noted as follows:

> "It may well be doubted whether any distinction should now be made between the proof necessary to convict of perjury and that necessary to convict of other crimes. See State v. Storey, 148 Minn. 398, 182 N.W. 613, 15 A.L.R. 629; Marvel v. State, 3 W. W. Harr., Del., 110, 131 A. 317, 42 A.L.R. 1058; Wigmore on Evidence (2d ed.) vol. 4, sec. 2040. The old 'oath against oath' reasoning of the earlier decisions is without force now that the defendant is allowed to take the stand and that corroboration sufficient to satisfy the jury of the falsity of the oath may well arise from his demeanor and manner of testifying. Boren v. United States, 9 Cir., 144 F. 801, 806; State v. Miller, 24 W.VA. 802. And in any event it is difficult to see why there should be any greater reason for charging with respect to the necessity of corroboration in such cases than there is for charging on the necessity of corroborating the testimony of an accomplice, and on the duty of scrutinizing such testimony, as to which we have recently held that the giving of such charge is a matter resting in the sound discretion of the trial judge. Both go to the weight to be accorded testimony by the jury; and the ordinary rule is that charging as to such matters should rest in the sound discretion of the trial judge, upon whom rests the duty of guiding and directing the jury in their consideration of the case."

In *Cohen v. United States,* 27 F.2d 713, 714 (2d Cir. 1928), Judge Learned Hand, in commenting on the two-witness rule, observed as follows:

> "The doctrine itself has indeed a rational basis when applied to mere recantations, though it must be owned that, if extended to

the oath of another than the perjured witnesses, it is hard to justify in a court of common law."

Justice Holmes observed as follows:

> "It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitation of the past."

Oliver Wendell Holmes, Jr., *The Path of the Law*, 10 HARV L. REV. 457, 469 (1897).

Finally, as is apparent from the discussion in the majority opinion, the "two-witness rule" for perjury cases is neither a "rule" applicable to all perjury cases, nor does it necessarily require *two* witnesses. *See* Maj. op. at 6-9. In attempting to reconcile the alien origin of the "rule" to modern conceptions of the burden of proof and the sufficiency of evidence, this Court and others have developed various exceptions. Ironically, under those exceptions, the strictures of the rule do not apply if the State's case consists entirely of circumstantial evidence. *Smith v. State*, 51 Md. App. 408, 420 (1982). Similarly, it is sometimes stated that the rule may be satisfied with a single witness if there is other admissible evidence of "equal weight" to substitute for the second witness. *State v. McGagh*, 472 Md. 168, 203 (2021). This approach echoes the origin of the rule in counting numbers of witnesses (rather than looking to the substance of the witnesses' testimony) and simply invites a judge to intrude into the province of the jury in determining the weight of the evidence.

5

In short, it appears as though the only crime requiring corroboration for conviction is perjury.[5] In today's world it makes no sense.

The doctrine of *stare decisis* is not a bar to the abrogation of the two-witness rule in this case. We all know that *stare decisis* is not absolute. *Unger v. State*, 427 Md. 383, 417 (2012) (quoting *State v. Green*, 367 Md. 61, 78-9 (2001)). *Stare decisis* is most meaningful in those areas of the law where individuals and entities order their affairs in reliance on past court decisions. *See, e.g.*, *Austin v. City of Baltimore*, 286 Md. 51, 68 (1979) (Eldridge,

---

[5] In *State v. Storey,* 182 N.W. 613, 615 (1921), the Minnesota Supreme Court reviewed the rule, concluding as follows:

> "The question is a new one in this state and we are at liberty to choose the rule which appeals to us as being most consonant with reason. Notwithstanding the high authority above cited, we are of the opinion that the rule laid down is out of harmony with our system of jurisprudence. In our opinion it is one of the rules of the common law inapplicable to our situation and 'inconsistent with our circumstances,' and hence not to be followed. *See State v. Pulle*, 12 Minn. 164 (Gil. 99). We find ourselves unable to approve the doctrine that perjury is a more heinous crime than murder or that one charged with perjury should have greater immunity than one charged with murder. Suppose for example the only eyewitness to a murder should testify that the accused is not the man who committed the crime and yet the circumstantial evidence of guilt is so strong that the jury convicts of first degree murder. With what consistency can it be said that a quality of testimony which will justify a court in condemning a defendant to life imprisonment, or, in some jurisdictions, to be hanged, is insufficient to sustain a conviction of the falsifier of the crime of perjury for which he may suffer a penalty of a short term of imprisonment. The lightness with which we are pained to say, the oath of a witness is too often treated, does not warrant us in making conviction of the crime of perjury most difficult of all crimes of which state courts have jurisdiction. We hold that perjury may be proved by circumstantial evidence if proof is made beyond reasonable doubt, as in the case of other crimes. Nor is this doctrine without authority to sustain it. *Metcalf, Ex parte*, 8 Okl. Cr. 605, 129 Pac. 675, 44 L. R. A. (N.S.) 513. *See People v. Doody*, 172 N. Y. 165, 64 N. E. 807, holding that the old rule has no application where the proof of the crime is necessarily based on circumstantial evidence."

J. concurring) (noting that *stare decisis* is compelling in areas of the law such as testamentary law, property law, and commercial law, but less so in other areas of the law). It seems unlikely that many people order their affairs in reliance on the "two-witness rule" for perjury cases—and it would be difficult to do so, given the rule's exceptions.

It is time that this Court ends its blind imitation of the past on this subject and relegates the "two-witness rule" to the history books.

I am authorized to state that Judge McDonald joins in this opinion.